UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------- X

ADRIANNE WILLIAMS,

               Plaintiff,

    v.

MICHAEL ASTRUE,
Commissioner of Social Security,

               Defendant.

--------------------------------------- X

                    NOT FOR PUBLICATION

                    **MEMORANDUM & ORDER**

                    09-CV-3997(KAM)

**MATSUMOTO, United States District Judge:**

        Pursuant to 42 U.S.C. § 405(g),[1] plaintiff Adrianne Williams ("plaintiff"), appeals the final decision of defendant Michael J. Astrue, Commissioner of Social Security ("defendant" or "Commissioner"), who denied plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). Proceeding *pro se*, plaintiff contends that she is entitled to receive SSI benefits due to severe medically determinable impairments, which she alleges render her disabled and prevent her from performing any work. Presently before the court is defendant's motion for judgment on the pleadings. For the reasons stated below, defendant's motion

---

[1]    Individuals may seek judicial review in the United States district court for the judicial district in which they reside over any final decision of the Commissioner rendered after a hearing to which they were a party, within sixty days after notice of such decision or within such further time as the Commissioner may allow. *See* 42 U.S.C.A. § 405(g).

is denied and the case is remanded for furthering proceedings consistent with this opinion.

**BACKGROUND**

## A. Procedural History

Plaintiff filed for SSI benefits on January 26, 2007, alleging disability due to arthritis, high blood pressure, asthma, heart problems, tendonitis in the left arm, and leg pain and swelling in both legs. (Tr. 88.)[2] Plaintiff stated that her disabilities made her forgetful, unable to lift or pull heavy objects, and caused her to tire easily. (*Id.*) Plaintiff claimed she had not been able to work since September 1, 2003 due to pain in her legs.[3] (*Id.*) The Social Security Administration ("SSA") denied her application on July 12, 2007. (Tr. 34-37.) On August 21, 2007, plaintiff requested a hearing on her SSI application before an administrative law judge. (Tr. 39-42.) The request was received (Tr. 43-49), and a hearing was scheduled for May 2, 2008. (Tr. 56-62.) The hearing was subsequently rescheduled, and held on July 21, 2008 before Administrative Law Judge Lucian A. Vecchio (the "ALJ"). (Tr.

---

[2]     The abbreviation "Tr." refers to the administrative record (Tr. 1-235), and the supplemental administrative record. (Tr. 236-47).

[3]     In an application dated February 27, 2007, plaintiff claimed her disability began on August 1, 1990. (Tr. 77.) On March 5, 2007, in a Disability Report (Form SSA-3367) that a Social Security field office employee filled out following a telephone interview with plaintiff, plaintiff claimed to have been disabled since September 1, 2003. (Tr. 84-86.)

(Tr. 19-32, 66-72.) Although the Commissioner informed plaintiff she had the right to have counsel represent her at the administrative hearing, she chose to proceed without counsel. (Tr. 21-22, 43-44.)

On August 22, 2008, the ALJ issued a decision denying plaintiff's application for SSI. (Tr. 9-18.) After reviewing the entire record, including plaintiff's medical files, the ALJ determined that plaintiff had severe impairments due to arthritis in the knees, asthma, hypertension, obesity, and residual effects of thyroid cancer.[4] (Tr. 14.) However, the ALJ found that the impairments did not individually or in combination meet or equal one of the impairments listed in the regulations.[5] (*Id.*) The ALJ concluded that plaintiff was not significantly limited in her ability to perform the full range of light work.[6] (*Id.*)

---

[4]    "If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled."  20 C.F.R. § 416.920(c).

[5]    "If you have an impairment(s) which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 416.920(d).

[6]    "Light work requires the ability to lift up to 20 pounds occasionally, lift 10 pounds frequently, stand and walk for up to 6 hours a day, and sit for up to two hours."  *Mancuso v. Astrue*, 361 Fed. Appx. 176, 178 (2d Cir. 2010); *see also* 20 C.F.R. §§ 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.")

On September 15, 2008, plaintiff requested review of the ALJ's decision by the Appeals Council. (Tr. 6-8.) On July 30, 2009, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision on plaintiff's claim for benefits. (Tr. 1-5.) This *pro se* action followed.

## B. Non-Medical Facts in the Administrative Record

### 1. Background

Plaintiff was born on January 20, 1961 and is a United States citizen. (Tr. 77.) The record indicates that plaintiff completed either the 10th or the 11th grade.[7] (Tr. 24, 93.) She is able to speak, understand, read, and write in English. (Tr. 87.) During the time period relevant to the SSI application, plaintiff lived in Brooklyn with three of her children, ages 16, 12, and 8. (Tr. 106.)

### 2. Employment History

Plaintiff's Disability Report (Form SSA-3368) shows that she worked intermittently in the following jobs from 1977 through 2002, with multi-year gaps in employment. (*See* Tr. 87-94.) During the summers of 1977 and 1978, plaintiff did office

---

[7] At the hearing, the ALJ asked plaintiff "What's the last year in school that you finished?" (Tr. 24.) Plaintiff replied "Between ninth and tenth, I mean, tenth and eleventh." However, in a Disability Report – Adult (Form SSA-3368), plaintiff stated that she completed the 11th grade.

work for a summer youth program. (Tr. 89.) In 1979, plaintiff worked as a cashier in a card store and in a fast food restaurant, as an office worker, and at a supermarket. (*Id.*) In 1983 and 1984, plaintiff worked as a bag screener for a security company. (*Id.*) As a bag screener, she was on her feet for approximately seven and a half hours a day, during which she walked, stood, stooped, crouched, and handled bags weighing less than ten pounds. (Tr. 89-90.) She cleaned hotel rooms in 1987. (Tr. 89.) In 1989, plaintiff performed customer service work for a bus company. (*Id.*) Plaintiff did office work in 1991. (*Id.*) She also worked in a school lunchroom from May to August 1991. (Tr. 89, 117.) Plaintiff reported that she did not work from 1992 to 1997 because she was raising her children. (Tr. 94.) Plaintiff worked in customer service in 1998. (Tr. 89.) Her last reported job on the Disability Report was as a babysitter from 2001 to 2002.[8] (Tr. 89.) She indicated that she worked from home in 2002 and 2003 because it was "much easier" considering her health problems.[9] (Tr. 88.) Plaintiff stated that she did not work at all in 1981, 1982, 1985, 1986, or from

---

[8] Plaintiff's account of her employment history varied in different parts of the record. (*See* Tr. 24-25, 89, 94, 117.) At the hearing, plaintiff stated that she stopped working in 1983 due to health issues. (Tr. 24-25.) In a Disability Report (Form SSA-3368), plaintiff stated that she last worked in 2003. (Tr. 94, *see also* Tr. 89.) A Disability Report (Form SSA-3367), filled out for plaintiff via telephone, noted that claimant "had a difficult time remembering dates and employment history." (Tr. 86.)

[9] Plaintiff did not indicate what kind of work she performed in 2003.

1992 to 1997.  (Tr. 94.)

## C. Medical Evidence in the Administrative Record

### 1. Medical Evidence Prior to the SSI Claim[10]

Plaintiff was examined at Kings County Hospital Center ("KCHC") on June 5, 1997 because of right knee pain lasting one week that was both diffuse and also present in the patella.[11] (Tr. 146).  An evaluation of the right knee found that it was normal.  (*Id.*)

Plaintiff was examined at KCHC for pelvic inflammatory disease,[12] asthma, a urinary tract infection, edema,[13] and urticaria[14] on May 19, 1998.  (Tr. 123, repeated at Tr. 141.) The examining physician described the plaintiff as a "high complexity" patient.  (*Id.*)

On May 9, 2003, plaintiff was treated for bronchitis at the KCHC emergency room.  (Tr. 125.)  The attending

---

[10]    SSI benefits are generally not payable for any month prior to the month the application is filed.  42 U.S.C. § 1382(c)(7); 20 C.F.R. §§ 416.330 and 416.335.  Here, plaintiff filed her application on January 26, 2007.

[11]    The patella is the kneecap.  Stedman's Medical Dictionary 300550 (27th Ed. 2000) ("Stedman's").

[12]    Pelvic inflammatory disease is an infection of the female reproductive organs that causes symptoms such as lower abdominal pain. It can lead to infertility, pregnancy complications, abscesses, and chronic pelvic pain. Centers for Disease Control and Prevention, STD Facts – Pelvic Inflammatory Disease, *available at* http://www.cdc.gov/std/pid/stdfact-pid.htm (last visited December 9, 2010).

[13]    "Edema is swelling caused by excess fluid trapped in your body's tissues."  MayoClinic.com, Edema, *available at* http://www.mayoclinic.com/health/edema/DS01035 (last visited December 9, 2010).

[14]    Urticaria is an eruption of itching hives.  Stedman's at 428900.

radiologist reported subsegmental platelike atelectasis[15] at the
base of the left lung.  (*Id.*)

X-rays of both of plaintiff's knees taken on March 23,
2005 revealed a mild loss of joint space in the medial[16]
compartment.  (Tr. 169, repeated at Tr. 207, 226.)  Plaintiff's
knees showed normal mineralization.[17]  (*Id.*)  On June 15, 2005, a
magnetic resonance image ("MRI") of plaintiff's knees revealed a
small synovial effusion,[18] a possible tear of the posterior horn
of the medial meniscus[19] and a possible tear of the medial
collateral ligament[20] in the right knee.  (Tr. 167, repeated at
Tr. 205, 224.)  The left knee had a tear of the posterior horn
of the medial meniscus, and synovial fluid.  (*Id.*)  An x-ray of
the plaintiff's lumbar spine[21] and sacroiliac joints[22] showed mild

---

[15]    Subsegmental platelike atelectasis is a collapse of a portion of the
lung.  Stedman's at 36120.

[16]    Medial relates to the middle or center.  Stedman's at 243170.

[17]    Mineralization is "[t]he introduction of minerals into a structure, as
in the normal mineralization of bones and teeth or the pathologic
mineralization of tissues."  Stedman's at 256360.

[18]    Synovial effusion is "increased fluid in [the] synovial cavity of a
joint."  A synovial joint's "opposing bony surfaces are covered with a layer
of" cartilage or fibrocartilage.  Stedman's at 125240, 214890.

[19]    The medial meniscus is "crescent-shaped . . . cartilage of the knee
joint attached to the . . . tibia occupying the space surrounding the
contacting surfaces of the femur (thigh bone) and tibia (shin bone)."
Stedman's at 246610.

[20]    The medial collateral ligament connects the end of the femur to the top
of the tibia.  MedlinePlus Medical Encyclopedia, Medial Collateral Ligament,
*available at* http://www.nlm.nih.gov/medlineplus/ency/imagepages/8864.htm
(last visited December 9, 2010).

[21]    The lumbar spine is located between the ribs and the pelvis.  Stedman's
at 233320.

scoliosis[23] and mild degenerative changes.  (Tr. 168, repeated at Tr. 206, 225.)

Plaintiff was examined at the KCHC orthopedic clinic on August 2, 2006, on a referral from her primary care physician.  (Tr. 122, 124, repeated at Tr. 140, 145.)  Plaintiff complained of knee pain that began after she fell ten years ago.  (Tr. 122, repeated at Tr. 140.)  The knee pain had neither worsened nor improved since the fall.  (*Id.*)  The examining physician noted the plaintiff had crepitus[24] in the right knee, but was fully functioning and had a range of motion in the both knees from zero to 130 degrees.[25]  (*Id.*)  A Lachman test[26] and a

---

[22]    Sacroiliac joints are on either side of the lower back.  They allow "little motion and are subject to great stress, as the body's weight pushes downward and the legs and pelvis push upward against them. The joints must also bear the leverage demands made by the trunk of the body as it turns, twists, pulls, and pushes."  Dorland's Medical Dictionary (Elsevier 2007), *available at* http://www.mercksource.com/pp/us/cns/cns_hl_dorlands_split. jsp?pg=/ppdocs/us/common/dorlands/dorland/nine/000617847.htm (last visited December 9, 2010) ("Dorland's").

[23]    "Scoliosis is a sideways curvature of the spine. . . .  Most cases of scoliosis are mild, but severe scoliosis can be disabling. An especially severe spinal curve can reduce the amount of space within the chest, making it difficult for the lungs to function properly."  MayoClinic.com, Scoliosis, *available at* http://www.mayoclinic.com/health/scoliosis/DS00194 (last visited December 9, 2010.)

[24]    Crepitus is "the grating of a joint, often in association with osteoarthritis."  Stedman's at 94470.

[25]    Zero to 130 is the normal value for the range of motion of the knee. *See* Merck Manuals Online Medical Library, Physical Therapy (PT), *available at* http://www.merck.com/mmpe/sec22/ch336/ch336b.html?qt=range%20of%20motion&alt= sh#S21_CH336_T001 (last visited December 9, 2010) ("Merck Manuals").

[26]    A Lachman test is a maneuver to detect a tear in the anterior cruciate ligament ("ACL").  *See* Stedman's at 403610.

McMurray test[27] were both negative.  (*Id.*)  X-rays showed narrowing[28] and osteophyte[29] formation of the medial compartments of both knees.  (Tr. 124, repeated at Tr. 145.)  Irregularity of the dorsal patella cortices in both knees was also present.[30]  (*Id.*)  The attending radiologist noted that the examination was otherwise unremarkable.  (*Id.*)

On October 3, 2006, plaintiff was seen at the KCHC physical medicine and rehabilitation unit, on referral from the orthopedic clinic due to her persistent knee pain.  (Tr. 121, repeated at Tr. 139.)  The plaintiff reported four to five falls during her pregnancies, and stated that she could only walk two blocks before experiencing pain and that she had difficulty climbing stairs.  (*Id.*)  A report from the visit states that plaintiff had a partial hysterectomy in February 2006 and surgery on her thyroid in April 2006.  (*Id.*)  The examining physician noted that plaintiff's knees were swollen, with the right knee more swollen than the left knee.  (*Id.*)  Plaintiff

---

[27]    A McMurray test is performed by rotating the leg to detect a tear in the meniscus of the knee.  *See* Stedman's at 403610.

[28]    The presence of narrowing is used in the diagnosis of osteoarthritis. See Merck Manuals, Physical Therapy (PT), *available at* http://www.merck.com/ mmpe/sec04/ch034/ch034e.html?qt=narrowing%20medial%20compartment%20knee&alt=s h (last visited December 9, 2010).

[29]    An osteophyte is "[a] bony outgrowth or protuberance."  Stedman's at 289250.

[30]    The dorsal patella cortice is the outside of the back of the kneecap. *See* Stedman's at 118850, 300500, 91810.

described her knee pain as having an aching quality. (*Id.*)

Plaintiff showed full range of motion and had a manual muscle

test rating of five out of five, representing full muscle

strength. (*Id.*) The physician recommended that plaintiff

complete four to six physical therapy sessions to strengthen her

quadriceps, and that she continue taking Motrin when necessary.

(Tr. 121, repeated at Tr. 139.)

  2. Medical Evidence From the Relevant Period

    a. *KCHC Cardiology Clinic*

        On January 31, 2007, plaintiff was examined at the

KCHC cardiology clinic following an abnormal echocardiogram.[31]

(Tr. 119-20, repeated at Tr. 137-38.) The examining physician

diagnosed moderate concentric left ventricular hypertrophy.[32]

Plaintiff denied having chest pains or shortness of breath.

(Tr. 119, repeated at 137.) She reported her exercise tolerance

to be two to three blocks walking. (*Id.*) No orthopnea[33] or

---

[31]    "An echocardiogram uses sound waves to produce images of your heart"
that can be used to "identify various abnormalities in the heart muscle and
valves." MayoClinic.com, Echocardiogram, *available at* http://www.mayoclinic.
com /health/echocardiogram/MY00095 (last visited December 9, 2010).

[32]    "Left ventricular hypertrophy is enlargement . . . of the muscle tissue
that makes up the wall of the heart's main pumping chamber . . . ."
MayoClinic.com, Left Ventricular Hypertrophy, *available at* http://www.
mayoclinic.com/health/left-ventricular-hypertrophy/ds00680 (last visited
December 9, 2010).

[33]    Orthopnea is "[s]hortness of breath when lying down." MayoClinic.com,
Pericardial Effusion, *available at* http://www.mayoclinic.com/health/
pericardial-effusion/DS01124/ DSECTION=symptoms (last visited December 9,
2010).

paroxysmal nocturnal dyspnea[34] was found.  (*Id.*)  A recent stress

test had normal results.[35]  (*Id.*)  A urine analysis was positive

for protein.[36]  (*Id.*)  Plaintiff's blood pressure was 160/80

(systolic/diastolic).[37]  (*Id.*)  Plaintiff's heart rate was 80

beats per minute.  (Tr. 119, repeated at Tr. 137.)  The

physician diagnosed plaintiff with benign essential

hypertension,[38] and increased plaintiff's dosage of Diovan to

320mg.[39]  (Tr. 119-20, repeated at Tr. 137-38.)

    b. *Dr. Salon's Consultative Examination*

       Plaintiff underwent a consultative examination by Dr.

Aurelio Salon on April 6, 2007.  (Tr. 126-30.)  Dr. Salon noted

---

[34]    Paroxysmal nocturnal dyspnea is "acute [shortness of breath] appearing suddenly at night" that is caused by pulmonary congestion that results from a type of heart failure.  Stedman's at 122310.

[35]    "A stress test . . . is used to gather information about how well the heart works during physical activity. . . .[It] usually involves walking on a treadmill or riding a stationary bike while heart rhythm, blood pressure, and breathing are monitored."  MayoClinic.com, Stress Test, *available at* http://www.mayoclinic.com/health/stress-test/MY00977 (last visited December 9, 2010).

[36]    "Protein in urine (proteinuria), especially at higher levels, can indicate kidney disease or another serious condition."  MayoClinic.com, Protein in Urine, *available at* http://www.mayoclinic.com/health/protein-in-urine/MY00630 (last visited December 9, 2010).

[37]    Systolic blood pressure above 160, or diastolic blood pressure above 100, is indicative of severe hypertension.  Systolic blood pressure is measured when the heart is beating, and diastolic blood pressure is measured between beats.  MayoClinic.com, High Blood Pressure (Hypertension): Tests and Diagnosis, *available at* http://www.mayoclinic.com/health/high-blood-pressure/DS00100/DSECTION=tests-and-diagnosis (last visited December 9, 2010).

[38]    Benign essential hypertension runs a relatively long, symptomless course and has no known cause.  Stedman's at 193510.

[39]    Diovan is the brand name of Valsartan, a medicine used to treat high blood pressure.  MayoClinic.com, Valsartan (Oral Route), *available at* http://www.mayoclinic.com/health/drug-information/DR601611 (last visited December 9, 2010).

that plaintiff had been diagnosed with goiter in 2005,[40] and underwent a subtotal thyroidectomy in 2006.[41] (Tr. 126.) Dr. Salon also remarked that plaintiff was diagnosed with asthma in 1987, and visited an emergency room on a few occasions. (*Id.*) Plaintiff's last reported asthma attack was in October 2006, and she reported averaging about three or four a year. (*Id.*) Plaintiff told Dr. Salon she had been suffering from knee pain and swelling for "a couple of years," and as a result, had undergone six to eight weeks of physiotherapy beginning in October 2006. (*Id.*) She informed Dr. Salon that she still suffered from "off and on" pain in her knees. (*Id.*) Dr. Salon noted that plaintiff was diagnosed with a heart murmur and an enlarged heart in 1980,[42] but noted that plaintiff showed no symptoms and had never been prescribed medication for her heart murmur. (Tr. 126.) Dr. Salon also noted that plaintiff complained of left elbow pain in 2006 and was diagnosed with tendinitis and given pain medications. (Tr. 127.) She told Dr.

---

[40]    Goiter is enlargement of the thyroid gland. MayoClinic.com, Goiter, *available at* http://www.mayoclinic.com/health/goiter/DS00217 (last visited December 9, 2010).

[41]    A subtotal thyroidectomy is the surgical removal of more than two-thirds of the thyroid. The intact part of the gland continues to function. Dorland's, Thyroidectomy, *available at* http://www.mercksource.com/pp/us/cns/cns_hl_dorlands_split.jsp?pg=/ppdocs/us/common/dorlands/dorland/eight/0001087 38.htm (last visited December 9, 2010).

[42]    Heart murmurs are abnormal sounds during your heartbeat cycle. MayoClinic.com, Heart Murmurs, *available at* http://www.mayoclinic.com/health/heart-murmurs/DS00727 (last visited December 9, 2010).

12

Salon that she continued to suffer from "off and on pain" in the elbow. (*Id.*) Dr. Salon indicated that plaintiff had a partial hysterectomy in 2005 due to abnormal uterine bleeding.[43] (*Id.*)

At the time of the examination, plaintiff was taking the following medications: Diovan, Hydralazine,[44] Advair,[45] Lodine,[46] Tylenol, and Albuterol.[47] (*Id.*) Plaintiff told Dr. Salon she has smoked since she was a teenager and still smoked five or six cigarettes a day.[48] (*Id.*).

Dr. Salon's report stated that plaintiff was able to cook, clean, do laundry, and shop, but that she needed the help of her children occasionally.[49] (*Id.*) Dr. Salon's report

[43]    The record also indicates that the partial hysterectomy may have been performed in February 2006. (Tr. 121, repeated at 139.)

[44]    Hydralazine is used to treat high blood pressure. MayoClinic.com, Hydralazine (Oral Route, Injection Route, Intravenous Route), *available at* http://www.mayoclinic.com/health/drug-information/DR600757 (last visited December 9, 2010).

[45]    Advair is the brand name of a combination of fluticasone and salmeterol. They "are used to help control the symptoms of asthma and improve breathing." MayoClinic.com, Fluticasone and Salmeterol (Inhalation Route), *available at* http://www.mayoclinic.com/health/drug-information/ DR600459 (last visited December 9, 2010).

[46]    Lodine is the brand name of etodolac, "a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain, and helps to relieve symptoms of arthritis . . . ." MayoClinic.com, Etodolac (Oral Route), *available at* http://www.mayoclinic.com/health/drug-information/DR602209 (last visited December 9, 2010).

[47]    Albuterol is used to treat wheezing caused by conditions such as asthma. MayoClinic.com, Albuterol (Oral Route), *available at* http://www.mayoclinic.com/health/drug-information/DR603117 (last visited December 9, 2010).

[48]    Plaintiff also told certain physicians that she has rarely or never smoked. (Tr. 119, repeated at 137 121, repeated at 139, 185.)

[49]    This statement is inconsistent with statements plaintiff made in her Disability Report, which states that plaintiff's family helps her prepare

further stated that plaintiff was able to shower and dress herself, but that she sometimes needs her children to put on her shoes. (*Id.*) Dr. Salon described plaintiff as obese; at the time of the examination, she was five feet two inches tall and weighed 203 pounds. (*Id.*) She appeared to be in no acute distress. (*Id.*) Her gait and stance were normal, she could walk on her heels and toes without difficulty, and she was able to squat one-third of the way. (Tr. 127-28.) She did not require help changing into or out of her clothing for the exam, getting on and off the exam table, or rising from her chair. (Tr. 128.) Dr. Salon detected a one-sixth apical heart murmur.[50] He did not observe any problems with plaintiff's musculoskeletal system, extremities, or hand function. (Tr. 128-29.) An x-ray of the right knee showed moderate osteoarthritic changes. (Tr. 129, 131.) Dr. Salon diagnosed hypertension, bronchial asthma, arthralgias[51] of the knees and left elbow, an asymptomatic heart murmur, and obesity. (Tr. 129.) Dr. Salon stated that he made

---

meals, which she does approximately once every three days. The report also indicates that she does some light cleaning but relies on her children to do most of it, and that she shops approximately once a month with the help of her children. (Tr. 107-11.)

[50]    Heart murmurs are rated on a scale from one to six, with six being the loudest. MayoClinic.com, Heart Murmurs: Tests and Diagnosis, *available at* http://www.mayoclinic.com/health/heart-murmurs/DS00727/DSECTION=tests-and-diagnosis (last visited December 9, 2010).

[51]    Arthralgias is joint pain. MayoClinic.com, Joint Pain, *available at* http://www.mayoclinic.com/health/joint-pain/MY00187 (last visited December 9, 2010).

"no objective findings to support the fact that the claimant

would be restricted in her ability to sit or stand or in her

capacity to climb, push, pull, or carry heavy objects." [52] (*Id.*)

Dr. Salon advised the plaintiff to avoid "smoke, dust, and other

known respiratory irritants because of [her] history of

bronchial asthma." (*Id.*)

    c. *Disability Examiner's Physical Residual Functional*
       *Capacity Assessment*

On July 12, 2007, a disability examiner filed a

Physical Residual Functional Capacity ("RFC") Assessment of

plaintiff. (Tr. 147-52.) The examiner believed that plaintiff

could occasionally lift items weighing up to twenty pounds,

frequently lift items weighing up to ten pounds, stand or walk

for up to six hours a day if provided breaks, sit for six hours,

and push or pull items, such as hand or foot controls, without

limits. (Tr. 148.) The examiner thought plaintiff could never

climb ramps, stairs, ladders, ropes, or scaffolds, but could

occasionally balance, stoop, kneel, crouch, or crawl. (Tr.

149.) The examiner found no limits on the plaintiff's ability

to see, communicate, or manipulate objects with her hands. (Tr.

149-50.) The assessment noted that plaintiff was not able to

---

[52]    As discussed further herein, Dr. Salon's opinion is contradicted by the
opinion of Dr. Subhendu Kundu, plaintiff's primary care physician, in a
Medical Source Statement. (*See* Tr. 155, 158.)

work in enclosed areas with dust or fumes because of asthma, but placed no other environmental limits on her potential employment. (Tr. 150.)

d. *Plaintiff's Thyroid Cancer*

On March 6, 2008, plaintiff had the remaining piece of her thyroid removed. (Tr. 162, repeated at Tr. 170.) No evidence of malignancy was found. (Tr. 163, repeated at Tr. 171.) On March 28, 2008, Dr. Agnieszka Gliwa, an endocrinologist, wrote a letter stating that she was treating plaintiff for thyroid cancer and asked that plaintiff be excused from work until April 28, 2008. (Tr. 174.) On April 11, 2008, Dr. Subhendu Kundu, plaintiff's primary care physician, wrote a similar letter stating that he was treating plaintiff for hypertension, arthritis, mild to moderate asthma, and thyroid cancer. (Tr. 176.) Dr. Kundu recommended that plaintiff delay any new work program at that time due to her cancer treatment and arthritis. (*Id.*)

On May 15, 2008, plaintiff underwent radioiodine ablation treatment.[53] (Tr. 234.) Plaintiff was discharged the following day and advised to maintain a low salt diet and to

---

[53] Radioiodine ablation is a procedure in which a large dose of radioiodine is administered in order to kill thyroid cells. Krames Patient Education, The Thyroid Book, *available at* http://www.mercksource.com/pp/us/cns/cns_krames_template.jspzQzpgzEzzSzppdocszSzuszSzcnszSzcontentzSzkrameszSz1592_10zPzhtm (last visited December 9, 2010).

perform activities she could tolerate. (Tr. 233.)  On June 2,

2008, plaintiff underwent a whole body scan that showed no

evidence that the cancer had spread from the thyroid. (Tr. 196,

repeated at 217, 234.)

   e. *Dr. Kundu's Assessment*

      On April 25, 2008, plaintiff's treating physician, Dr.

Kundu, filled out a Medical Source Statement of Ability to Do

Work-Related Activities (Physical).[54]  (Tr. 155-61.)  In Dr.

Kundu's opinion, plaintiff could occasionally lift or carry

items weighing up to twenty pounds. (Tr. 155.)  Dr. Kundu wrote

that, as a result of plaintiff's hypertension, asthma,

arthritis, and obesity, she "might be able to lift object[s] up

to twenty [pounds] but carrying for [a] period of time will be

difficult because of her condition." (*Id.*)  Dr. Kundu estimated

that plaintiff could sit for five hours, stand for two hours,

and walk for one hour, without interruption. (Tr. 156.)  He

estimated that those were also her limits in total during an

eight-hour work day. *(Id.)*  Dr. Kundu wrote that plaintiff's

arthritis would cause pain in her knees if she had to stand or

walk "for long hours." (*Id.*)  He noted that she "suffer[s] from

arthritis with frequent swelling of her knee joints, [right knee

greater than left knee,] with overuse." (*Id.*)  Dr. Kundu

_____

[54]    This form is similar to the form filled out by the disability examiner
(Tr. 147-52), but asks for medical opinions.

indicated that plaintiff was able to continuously use her hands.
(Tr. 157.) She was able to frequently use her right foot and
continuously use her left foot to operate foot controls. (*Id.*)
Due to her obesity and arthritis, Dr. Kundu opined that
plaintiff could never climb ladders or scaffolds, balance,
kneel, crouch, or crawl. (Tr. 158.) He stated that she could
occasionally stoop and climb stairs or ramps, but that she would
have difficulty doing so. (*Id.*) However, Dr. Kundu indicated
that plaintiff should avoid unprotected heights, moving
mechanical parts, operating a motor vehicle, humidity and
wetness, dust, odors, fumes, and other pulmonary irritants,
extreme cold or heat, and vibrations. (*Id.*) He stated that
plaintiff could withstand moderate noise. (*Id.*) She was able
to shop, travel alone, walk without assistance, walk a block at
a reasonable pace on rough or uneven surfaces, use public
transit, climb a few steps at a reasonable pace without using a
handrail, prepare and eat a simple meal, take care of her
hygiene, and work with papers and files. (Tr. 160.) Dr. Kundu
stated that plaintiff complained of fatigue due to treatment for
thyroid cancer. (*Id.*) He indicated that plaintiff's
limitations lasted or would last for at least twelve consecutive
months. (*Id.*)

On July 17, 2008, Dr. Kundu submitted a second medical

source statement in which his opinion of plaintiff's condition and functional abilities remained unchanged.  (Tr. 189-195, repeated at Tr. 209-16.)

   f. *Dr. Guttman's Consultative Examination*

On May 27, 2008, plaintiff underwent a consultative examination by Dr. David Guttman.  (Tr. 184-87.)  Plaintiff complained to Dr. Guttman of asthma since childhood, with hospitalizations usually precipitated by exposure to certain types of weather or dust.[55]  (Tr. 184.)  Plaintiff also stated she began suffering from hypertension in 1995, was suffering from fatigue following treatment for thyroid cancer, and had sharp knee pain that becomes exacerbated by walking.  (*Id.*)

At the time of the examination, plaintiff was taking Levothroid,[56] Calcitriol,[57] and calcium, in addition to the medications she was taking when Dr. Salon examined her.  She was

---

[55]    During her consultative examination with Dr. Salon, plaintiff reported being diagnosed with asthma in 1987.  (See Tr. 126.)

[56]    Levothroid is the brand name of Levothyroxine.  It "is used to treat hypothyroidism, a condition where the thyroid gland does not produce enough thyroid hormone.  Levothyroxine is also used to help decrease the size of enlarged thyroid glands (known as goiter) and to treat thyroid cancer." MayoClinic.com, Levothyroxine (Oral Route), *available at* http://www. mayoclinic.com/health/drug-information/DR602749 (last visited December 9, 2010).

[57]    "Calcitriol is a form of vitamin D that is used to treat and prevent low levels of calcium in the blood of patients whose kidneys or parathyroid glands (glands in the neck that release natural substances to control the amount of calcium in the blood) are not working normally."  MedlinePlus, Calcitriol, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a682335.html (last visited December 9, 2010).

no longer taking Lodine.  (*Id.*)

Plaintiff told Dr. Guttman that she did no cooking, cleaning, or laundry, but that she shopped, showered, and dressed with assistance.  (Tr. 185.)  Her blood pressure was 144/94,[58] and she weighed 225 pounds.  Dr. Guttman noted that plaintiff's gait and stance were normal and that she was able to walk on her toes without difficulty.  (*Id.*)  She needed no help changing clothes for the examination, getting on and off the table, or rising from her chair.  (*Id.*)  She was able to squat one-quarter of the way, and she declined to walk on her heels.  (*Id.*)

Dr. Guttman did not detect a heart murmur or scoliosis.[59]  (Tr. 186.)  He observed a normal range of motion in plaintiff's spine and joints, although she complained of tightness in her knee when flexing her lumbar spine to sixty degrees.  (*Id.*)  Dr. Guttman diagnosed asthma, hypertension, a cancerous thyroid, and patellofemoral syndrome with knee pain.[60]

---

[58]    Blood pressure of 144/94 qualifies as stage one hypertension. MayoClinic.com, High blood pressure (hypertension): Tests and diagnosis, *available at* http://www.mayoclinic.com/health/high-blood-pressure/DS00100/DSECTION=tests-and-diagnosis (last visited December 9, 2010).

[59]    Plaintiff was previously diagnosed with a heart murmur (Tr. 128-29) and with mild scoliosis.  (Tr. 168, repeated at Tr. 206, 225.)

[60]    Patellofemoral syndrome, or chondromalacia patella, "is the softening and degeneration of the cartilage underneath the kneecap. . . .  [It] may also be a sign of arthritis of the kneecap, which is usually seen in older individuals."  It can be exacerbated by long periods of sitting.

(*Id.*)  Dr. Guttman gave plaintiff a "fair" prognosis and opined

that she had "moderate restrictions to walking, bending,

lifting, squatting, and carrying because of patellofemoral

syndrome with knee pain." (Tr. 187.)  He also stated that she

should avoid respiratory irritants.  (*Id.*)

**D. Plaintiff's Written Reports**

1. <u>SSI Application</u>

Plaintiff filled out an application for SSI on February

27, 2007, claiming that her disability began on August 1, 1990.

(Tr. 77-79.)

2. <u>Disability Reports</u>

Plaintiff filled out a disability report on March 5,

2007.  (Tr. 87-94.)  In the report, plaintiff claimed that she

was forgetful at times, she could not lift heavy objects, and

she tired easily.  (Tr. 88.)  She stopped working in 2003

because of the pain in her legs.  (*Id.*)

On March 29, 2007, plaintiff's sister filled out

another disability report on plaintiff's behalf.  (Tr. 105-17.)

In the report, plaintiff claimed that her eldest child, mother,

sister, and other family members helped her dress her other

children and prepare their meals.  (Tr. 107.)  She said that she

MedlinePlus, Chondromalacia patella, *available at* http://www.nlm.nih.gov/
medlineplus/ency/article/000452.htm (last visited December 9, 2010).

prepared meals every three days. (Tr. 108.) Plaintiff stated that she could not walk or stand for long periods of time or lift or carry heavy things. (Tr. 107.) She said that pain in her legs, which would get stiff and "lock up," affected her ability to sleep. (*Id.*) Plaintiff stated that she also experienced pain when she bent over or dressed, that her legs and arms hurt when she bathed, and her arms and back hurt when she washed her hair. (*Id.*)

Plaintiff claimed that although she did some light cleaning and shopped for "light things," her children did most of the housework and shopping. (Tr. 109-10.) Once a month, plaintiff went shopping for about four to five hours. (Tr. 110.) She stated that she sometimes had difficulty handling money. (*Id.*) Plaintiff stated that her social activities were limited to spending time with her family. (Tr. 111.) She indicated that she had problems lifting, standing, walking, sitting, climbing stairs, kneeling, squatting, reaching, and using her hands. (*Id.*) Plaintiff said that she was able to walk one block before she needed to rest for five to ten minutes, she had a short attention span, and she repeated herself. (Tr. 112.) She indicated that she could not follow spoken or written instructions because she was forgetful. (*Id.*)

In addition, plaintiff felt pain her hands, feet,

spine, and hips.  (Tr. 114.)  She noted that she experienced

both "aching" and "stabbing" pains.  (*Id.*)  She also noted that

walking, going up and down stairs, standing, and sitting for

"too long" brought on pain.  (Tr. 115.)  Plaintiff stated that

the pain was present "all the time" and lasted "hours," that it

had gotten worse over time, and that it was "unbearable."  (*Id.*)

After the initial denial of benefits, plaintiff filed

another disability report[61] sometime between July 25, 2007 and

August 26, 2007[62] as part of her appeal that detailed changes to

her medical condition.  (Tr. 95-101.)  Plaintiff stated in her

disability report that the left side of her body swelled while

she slept, and that she suffered from stress because of her

"son's hyperactive behavior."[63]  (Tr. 96.)

**E. Hearing Testimony**

1. <u>Plaintiff's Testimony</u>

At the hearing held July 21, 2008, plaintiff stated

that she began to suffer from swelling in 1983 and stopped

working as a result.  (Tr. 24.)  Plaintiff testified that she

was subsequently diagnosed with arthritis, asthma, and high

blood pressure.  (*Id.*)  She said that she was currently not

---

[61]    Disability-Report-Appeal-Form SSA-3341

[62]    The form is not dated.

[63]    These were the only changes in her medical condition.

working because she had recently undergone iodine chemotherapy and was suffering from swelling in her feet and legs. (Tr. 25.) Plaintiff testified that the swelling caused her legs to become "hard," which made walking uncomfortable. (*Id.*) She claimed that she could only walk one and a half blocks before she had to rest because her legs and feet would begin to swell, with her ankles becoming particularly swollen. (Tr. 26.) Plaintiff testified that she also would suffer from pain in her knees. (*Id.*) When the ALJ asked plaintiff if there were any reasons why she could not sit for one hour at a time, she replied that she was also suffering from pain in her lower back and stiffness in her legs. (*Id.*)

In response to the medical expert's testimony, plaintiff stated that she could not stand for one straight hour due to swelling in her ankles. (Tr. 31.) Plaintiff testified that her children helped her shop and cook. (*Id.*) She also mentioned that her legs "lock a lot." (*Id.*) Finally, plaintiff testified that she took Tylenol and Advil to relieve pain. (Tr. 32.)

2. Witness Testimony

Shamika Torres ("Ms. Torres"), plaintiff's sister, testified that, on occasion, plaintiff could not get out of bed because of "her back locking, and her legs." (Tr. 27.) Ms.

24

Torres also stated that plaintiff had to be home to care for plaintiff's eight-year-old son who suffered from attention deficit hyperactive disorder and only attended school for part of the day. (*Id.*)

### 3. Medical Expert Testimony

On July 21, 2008, Dr. Bernard Gustaf testified as a medical expert at plaintiff's hearing with regard to her SSI application. (Tr. 27-30.) Dr. Gustaf was present for the hearing testimony and had reviewed the exhibits submitted to the court. (Tr. 28.) Dr. Gustaf testified that plaintiff's asthma was under control, so her lung impairment was not severe enough to qualify as a disability listed in the Regulations. (Tr. 29.) He stated that she did not have a lung insufficiency problem. (*Id.*) Dr. Gustaf stated that she could ambulate effectively despite her knee problems based on plaintiff's ability to walk her children to school. (*Id.*) He opined that plaintiff's major health issue was thyroid cancer for which she received treatment. (*Id.*) Dr. Gustaf stated that there was "no evidence of metastatic disease of even involvement of the regional lymph nodes," meaning plaintiff's thyroid condition did not meet the definition of a disability.[64] (*Id.*) Finally, Dr. Gustaf noted

---

[64] Metastatic refers to "the shifting of a disease or its local manifestations, from one part of the body to another . . .." Stedman's at 250590.

that plaintiff was obese. (*Id.*) He testified that, even in combination, plaintiff's conditions did not rise to the level of a disability. (Tr. 29.) Dr. Gustaf opined that plaintiff could walk, stand, or perform some combination of the two for one hour at a time, and could do so for a total of six hours a day if she took intermittent breaks. (Tr. 29-30.) He also felt that she could lift items weighing up to 20 pounds. (Tr. 30.)

## DISCUSSION

**A. Standard of Review**

1. <u>The Substantial Evidence Standard</u>

"A district court may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted). "Substantial evidence" is "more than a mere scintilla and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). An evaluation of the "substantiality of evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*,

859 F.2d 255, 258 (2d Cir. 1988).

Accordingly, if there is substantial evidence in the record to support the Commissioner's factual findings, those findings are conclusive and must be upheld. *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); *see also* 42 U.S.C. § 405(g). Moreover, the reviewing court "may not substitute its own judgment for that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

2. The ALJ's Affirmative Duty to Develop the Record and the ALJ's Duty to Apply the Proper Legal Standard

Notwithstanding the substantial deference afforded to the ALJ's determination, remand is appropriate for further development of the evidence where there are gaps in the administrative record or where the ALJ has applied an improper legal standard. *See Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999). "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Burgess*, 537 F.3d at 128; *see Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) ("[S]ocial security hearings are not [or

at least are not meant to be] adversarial in nature.").

Remand may be required where the ALJ fails to discharge his or her affirmative obligation to develop the record when making a disability determination. *See Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (holding that in deciding whether the Commissioner's findings are supported by substantial evidence, courts must first ensure that claimant is afforded a full and fair hearing and a fully developed record). Indeed, when a claimant proceeds *pro se*, the ALJ has a "heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) (citing *Echevarria*, 685 F.2d at 755).

**B. Legal Standards for Disability Claims**

1. The Commissioner's Five-Step Analysis of Disability Claims

A claimant is disabled within the meaning of the Act if he or she has an "inability to engage in any substantial gainful activity ["SGA"] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." U.S.C.

§ 423(d)(1)(A); *see also* 20 C.F.R. §§ 404.1572(a), 416.972(a) (defining "substantial gainful activity"). The impairment must be of "such severity that [the claimant] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The SSA has promulgated a five-step sequential analysis requiring the ALJ to make a finding of disability if he or she determines:

> (1) that the claimant is not working,[65] (2) that he [or she] has a 'severe impairment,'[66] (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability,[67] and (4) that the claimant is not capable of continuing in his [or her] prior type of work,[68] the Commissioner must find him disabled if (5) there is not another type of work that claimant can do.[69]

---

[65]    Under the first step, if the claimant is currently engaged in "substantial gainful employment," the claimant is not disabled, regardless of the medical findings. 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).

[66]    Under the second step, the claimant must have "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities" in order to have a severe impairment. 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii).

[67]    Under the third step, if the claimant has an impairment that meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is *per se* disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

[68]    Under the fourth step, the claimant is not disabled if he or she can still do his or her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv); *see also* 20 C.F.R. § 404.1520(f).   .

[69]    Under the fifth step, the claimant may still be considered not disabled

*Burgess*, 537 F.3d at 120 (internal citations omitted); *see also* 20 C.F.R. § 404.1520(a)(4).

The claimant must prove his case at steps one through four; thus, the claimant bears the "general burden of proving . . . disability." *Burgess*, 537 F.3d at 128. At the fifth step, the burden shifts from the claimant to the Commissioner, requiring the Commissioner to show that in light of the claimant's RFC, age, education, and work experience, he or she is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997). In making that determination, the Commissioner need not provide additional evidence about the claimant's RFC, but may rely on the same assessment that was applied in step four's determination of whether the claimant can perform his or her past relevant work. *See* 20 C.F.R. § 404.1560(c)(2); *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

At the fifth step, under appropriate circumstances, the Commissioner may meet his burden "by rely[ing] on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as 'the Grid.'" *See Mejia v. Astrue*, No. 09-CV-9656, 2010 WL 2572006, at *12

---

if he or she "can make an adjustment to other work" available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v); *see also* 20 C.F.R. § 404.1520(g).

(S.D.N.Y. June 28, 2010) (quoting *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996) (internal quotation marks omitted).  The Grid accounts for a claimant's RFC, age, education, and work experience, and uses those factors to determine whether a claimant can engage in any other SGA that exists in the national economy.  (*Id.*)

The Grid classifies types of employment into five categories based on the exertional requirements of the jobs. *Rosado v. Astrue*, 713 F. Supp. 2d 347, 365 (S.D.N.Y. 2010) (quoting *Zorilla*, 915 F. Supp. at 667 n.2); *see also* 20 C.F.R. § 404.1567(a).  Specifically, it "divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." *Rosado*, 713 F. Supp. 2d at 365 (quoting *Zorilla*, 915 F. Supp. at 667 n.2) (internal quotation marks omitted).  If a claimant has the RFC necessary to perform at least one category of work listed in the Grid, and if the claimant's education and other characteristics are reflected in the Grid, the Commissioner may rely solely on the Grid to determine whether the claimant has the RFC to perform "work other than his or her past work." *Fortier v. Astrue*, No. 09-CV-993, 2010 WL 1506549, at *13 (S.D.N.Y. Apr. 13, 2010) (citing *Butts*, 388 F.3d at 383).

"However, exclusive reliance on the [Grid] is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations." *Butts*, 388 F.3d at 383 (quoting *Rosa*, 168 F.3d at 78) (internal quotation marks omitted). As will be explained below, if a claimant has nonexertional limitations in addition to exertional limitations, the Grid may not be dispositive of the disability determination. *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986).

2. The Nonexertional Limitation Rule

"Limitations or restrictions which affect [the] ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional." *Butts*, 388 F.3d at 381 n.1 (quoting 20 C.F.R. § 416.969a(a)) (internal quotation marks omitted). Nonexertional limitations include "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching." *Id.* (quoting 20 C.F.R. § 416.969a(c)(vi)) (internal quotation marks omitted); *see also Washington v. Bowen*, 646 F. Supp. 1058, 1062 (S.D.N.Y. 1986) (referring to bending to be a nonexertional limitation). Nonexertional limitations also include "mental, sensory, or skin impairments," and environmental restrictions

such as "difficulty tolerating dust or fumes" due to asthma.
*Burgos v. Barnhart*, No. 01-CV-10032, 2003 WL 21983808, at *18 &
n.8, 19 (S.D.N.Y. Aug. 20, 2003) (internal citation and
quotation marks omitted).

As previously stated, where a claimant has both
exertional and nonexertional limitations, the Grid may not be
used as the "exclusive framework" for determining whether the
claimant is disabled according to Agency regulations.[70] *Johnston
v. Astrue*, No. 07-CV-5089, 2008 WL 4224059, at *11 (E.D.N.Y.
Sept. 8, 2008) (citing *Bapp*, 802 F.2d at 605); *see also* 20
C.F.R. § 404.1569(d) (stating that the Grid will not be directly
applied when the claimant's impairments hinder his or her
ability to satisfy the exertional and nonexertional requirements
of a job unless "there is a rule that directs a conclusion that
[the plaintiff] is disabled based upon his [or her] strength
limitations . . .."). This is because "if a claimant's
nonexertional impairments significantly limit the range of work

---

[70]     The introduction to the Grid likewise states:

> Where any one of the findings of fact does not coincide
> with the corresponding criterion of a rule, the rule does
> not apply in that particular case and, accordingly, does
> not direct a conclusion of disabled or not disabled.  In
> any instance where a rule does not apply, full
> consideration must be given to all of the relevant facts of
> the case in accordance with the definitions and discussions
> of each factor in the appropriate sections of the
> regulations.

20 C.F.R. § 404, Subpt. P, App. 2.

permitted by his exertional limitations, then the [Grid] obviously will not accurately determine disability status because [it] fail[s] to take into account claimant's nonexertional impairments." *Bapp*, 802 F.2d at 605 (internal citation and quotation marks omitted).

Accordingly, the "ALJ must consider and address on the record the combined effects of the claimant's exertional and non-exertional limitations and the advisability of additional testimony before resorting to the [Grid]." *Nigino v. Astrue*, No. 04-CV-3207, 2009 WL 840382, at *5 (E.D.N.Y. Mar. 30, 2009) (citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)). If the ALJ finds the nonexertional limitations significantly diminish the range of work the claimant can perform, the ALJ must hear testimony from a vocational expert or seek out similar evidence that there are jobs "in the national economy which the claimant can obtain and perform." *Id.* at *6 (citing *Rosa*, 168 F.3d at 78). The range of work is significantly restricted by nonexertional limitations when a claimant suffers an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him [or her] of a meaningful employment opportunity." *Bapp*, 802 F.2d at 606; *see also Baldwin v. Astrue*, No. 07-CV-6958, 2009 WL 4931363, at *27 (S.D.N.Y. Dec.

21, 2009).  Whether a claimant's nonexertional limitations

significantly diminish the range of work a claimant can perform

may be decided without the assistance of a vocational expert.

*See, e.g., Bapp*, 802 F.2d at 606.

3. The Treating Physician Rule and the Commissioner's Duty to
   Give "Good Reasons" for the Weight Given to Physicians'
   Opinions

          Under the Commissioner's regulations, the medical

opinion of a treating source "on the issue(s) of the nature and

severity of [the] impairment" will be given controlling weight

if such opinion "is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the]

record."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also*

*Burgess*, 537 F.3d at 128.  Medically acceptable clinical and

laboratory diagnostic techniques include consideration of a

"patient's report of complaints, or history, [a]s an essential

diagnostic tool."  *Green-Younger v. Barnhart*, 335 F.3d 99, 107

(2d Cir. 2003) (internal citation and quotation marks omitted).

According to the Commissioner's regulations, the opinions of

treating physicians deserve controlling weight because "these

sources are likely to be the medical professionals most able to

provide a detailed, longitudinal picture of [the] medical

impairment(s) and may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . ." *Balodis v. Leavitt*, No. 08-CV-3422, 2010 WL 1328943, at *8 (E.D.N.Y. Mar. 31, 2010) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).

Furthermore, when a treating physician's opinion on the nature and severity of a claimant's disability is not afforded "controlling" weight, the ALJ must "comprehensively set forth [his or her] reasons for the weight assigned to a treating physician's opinion." *Burgess*, 537 F.3d at 129 (quoting *Halloran*, 362 F.3d at 33) (internal quotation marks omitted). Although the regulations do not explicitly or exhaustively define what constitutes "good reasons" for the weight given to a treating physician's opinion, the regulations provide the following enumerated factors that guide an ALJ's determination when declining to afford controlling weight to a treating physician on the issue of the nature and severity of a disability: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treating relationship, (3) the supportability of the treating source opinion, (4) the consistency of the opinion with the rest of the record, (5) the specialization of the treating physician, and (6) any other relevant factors.  20 C.F.R. §§ 404.1527(d)

(2)-(6), 416.927(d)(2)-(6); *see also Snell v. Apfel*, 177 F.3d
128, 133 (2d Cir. 1999).

Although the SSA also considers opinions from treating
physicians regarding the RFC, disability, and employability of a
claimant, the final responsibility for determining these matters
is reserved to the Commissioner, not to physicians; therefore,
the source of an opinion on those matters is not given "special
significance" under the regulations. *Francois v. Astrue*, No.
No. 09-CV-6625, 2010 WL 2506720, at *6 (S.D.N.Y. June 21, 2010)
(citing 20 C.F.R. § 404.1527(e)(3)); *see also* 20 C.F.R.
§ 416.927(e)(1) ("A statement by a medical source that you are
'disabled' or 'unable to work' does not mean that we will
determine that you are disabled."); *Snell*, 177 F.3d at 133 ("A
treating physician's statement that the claimant is disabled
cannot itself be determinative."). In fact, "[t]he Commissioner
is not . . . even necessarily permitted, to accept any single
opinion, even that of a treating physician, as dispositive on
the determination of disability." *Francois*, 2010 WL 2506720, at
*5 (citing *Green-Younger*, 335 F.3d at 106).

Despite the fact that the disability determination is
reserved for the Commissioner, the Second Circuit has held that

ALJs are not exempt "from their obligation, under *Schaal*[71] and § 404.1527(d)(2), to explain why a treating physician's opinions are not being credited." *Snell*, 177 F.3d at 134 ("The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even - and perhaps especially - when those dispositions are unfavorable."); *see also* 20 C.F.R. § 404.1527(d)(2) (the SSA "will always give good reasons in [its] notice of determination or decision for the weight [given to the claimant's] treating source's opinion"); *Martinez v. Astrue*, No. 06-CV-6219, 2010 WL 331694, at *9 (S.D.N.Y. Jan. 28, 2010) ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." (quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996))) (internal quotation marks omitted).

An ALJ's failure to explicitly state "good reasons" for declining to adopt a treating source's opinion, even on issues that are determined by the Commissioner, is a ground for remand. *Snell*, 177 F.3d at 133-34 (remanding for a statement of the reasons why a treating source's finding of disability was rejected by the ALJ). An ALJ's failure to reconcile materially divergent RFC opinions of medical sources is also a ground for

---

[71]     *Schaal v. Apfel*, 134 F.3d 496 at 505 (2d Cir. 1998)

remand. *Caserto v. Barnhart*, 309 F. Supp. 2d 435, 445-46 (E.D.N.Y. 2004) (remanding, in part, where the ALJ failed to reconcile the conflicting RFC determinations made by plaintiff's treating physician and consulting physician and failed to specify why the consulting physician's conclusion was entitled to more weight than that of the treating physician.); *see also see also Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.") (internal citation omitted).

### 4. The Determination of Plaintiff's Credibility

Plaintiff's statements of pain or other symptoms cannot alone serve as conclusive evidence of disability. *See Francois*, 2010 WL 2506720, at *7 (citing 42 U.S.C. § 423(d)(5)(A)). The regulations therefore create a two-step process to evaluate a claimant's assertions about symptoms such as pain. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). First, the ALJ must determine if a claimant has a medically determinable impairment that "could reasonably be expected to produce the symptoms alleged." *Id*. (citing 20 C.F.R.

§ 404.1529(b)).  If an impairment of that nature is present, the ALJ must then determine "'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence'" in the administrative record.  *Id.* (quoting 20 C.F.R. § 404.1529(a); *see also Brown v. Astrue*, No. 08-CV-3653, 2010 WL 2606477, at *6 (E.D.N.Y. June 22, 2010) ("If the ALJ finds such impairments, he then evaluates the intensity and persistence of the symptoms to determine how they limit the claimant's functioning."); *cf. Simmons v. U.S. R.R. Retirement Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) ("[A] claimant's subjective evidence of pain . . . is entitled to great weight where . . . it is supported by objective medical evidence.") (internal citation and quotation marks omitted).  If plaintiff offers "statements about her symptoms that are not substantiated by objective medical evidence, the ALJ must make a finding as to the claimant's credibility."  *Alcantara v. Astrue*, 667 F. Supp. 2d 262, 277 (S.D.N.Y. 2009) (citing SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996)).  Because an ALJ has "the benefit of directly observing a claimant's demeanor and other indicia of credibility," his decision to discredit subjective testimony may not be disturbed on review if his disability determination is supported by substantial evidence.  *Brown*, 2010 WL 2606477, at

*6; *see Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("If the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain.") (internal citations omitted); *Alcantara*, 667 F. Supp. 2d at 277 ("[A]n evaluation of a claimant's credibility is entitled to great deference if it is supported by substantial evidence.").

When a claimant's symptoms indicate "a greater severity of impairment than can be shown by the objective medical evidence alone," the ALJ must consider these factors in making a credibility determination: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken; (5) other treatment received; (6) other measures taken to relieve symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii); *see Alcantara*, 667 F. Supp. 2d at 277-78. The ALJ is required to "consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony,"

taking into account the factors enumerated in 20 C.F.R.
§ 404.1529(c)(3).  *Alcantara*, 667 F. Supp. 2d at 277-78 (citing
SSR 96-7p, 1996 WL 374186, at *3).

**C. The ALJ's Decision**

Applying the five-step sequential analysis for
disability claims outlined above, the ALJ concluded at step one
that plaintiff "has not engaged in substantial gainful activity
since January 26, 2007," the date of plaintiff's alleged
disability onset date.  (Tr. 14).  At step two, the ALJ found
that the plaintiff suffered from the severe medically
determinable impairments of "arthritis of the knees, asthma,
hypertension, obesity[,] and residuals of thyroid cancer."
(*Id.*)  At step three, the ALJ determined that the medical record
failed to support a finding that plaintiff had "an impairment or
combination of impairments that meets or medically equals one of
the listed impairments" in Appendix 1 of the regulations.  (*Id.*)
In support of the determination at step three, the ALJ noted
that the plaintiff could "ambulate effectively," that "she has
not had chronic asthmatic bronchitis or attacks" that required a
physician's intervention "at least once every two months or at
least six times a year."  (*Id.*)  The ALJ stated that the
plaintiff had "no pulmonary function tests" that rose to the
level of a listed impairment.  (*Id.*)  The ALJ also found that

the claimant's hypertension was "fairly well controlled," and that her thyroid cancer was not anaplastic and had not spread. (*Id.*)

Before proceeding to steps four and five, the ALJ evaluated the entire record in order to determine the claimant's RFC.  The ALJ considered all symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence in the record. (Tr. 14).  Following the two-step standard, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the" RFC assessment in the record.  (Tr. 15-16.)

In order to support his determination, the ALJ reviewed the relevant medical evidence in the record beginning with the plaintiff's history of bronchial asthma.  (Tr. 15.) According to the ALJ, there was no evidence that the plaintiff "sought or received any further treatment [for asthma] until 2005."  (*Id.*)  The ALJ next discussed x-rays of plaintiff's knees from March 2005, x-rays of her lumbar spine and sacroiliac joints from June 2005, and MRIs of plaintiff's knees.  (*Id.*)

The ALJ noted that the plaintiff neither sought nor received any orthopedic treatment from June 2005 until August 2006, when plaintiff went to Kings County Hospital because of knee pain. (*Id.*)  Next, the ALJ noted plaintiff's return visit to KCHC on October 3, 2006, where she complained of persistent pain in both knees that began after walking two blocks, as well as difficulty climbing stairs.  (*Id.*)  Although the ALJ noted that the examination performed at KCHC revealed swelling in both knees and resulted in a diagnosis of osteoarthritis, he emphasized that plaintiff had full range of motion of her knees.  (*Id.*)  The ALJ noted that the orthopedist stated that the results of the examination were otherwise unremarkable.  (Tr. 15.)

The ALJ next discussed plaintiff's January 31, 2007 visit to the KCHC's cardiovascular clinic, where a physician noted that a recent stress test had normal results, and that her "exercise tolerance was two to three blocks." (Tr. 16.)  The ALJ mentioned that the plaintiff was diagnosed with benign essential hypertension.  (*Id.*)  The ALJ stated that the results were otherwise unremarkable.[72]  (*Id.*)

The ALJ's discussion then moved on to the report of Dr. Salon, and a review of the medical record by Mr. Ramos, a

_____

[72]    The court notes that, unlike the visit to the KCHC orthopedic clinic, the report of the January 31, 2007 visit did not contain a statement by a physician that the visit was "otherwise unremarkable."

44

state disability examiner. (*Id.*) The ALJ next mentioned that plaintiff "underwent a thyroidectomy and was diagnosed with thyroid cancer in March 2008. (*Id.*)

The ALJ then reviewed an April 25, 2008 assessment of plaintiff's RFC by Dr. Kundu, her treating physician. (*Id.*) The ALJ noted that Dr. Kundu made a similar RFC assessment on July 17, 2008. (Tr. 16.) The ALJ also addressed a May 27, 2008 examination of the plaintiff by Dr. David Guttman on behalf of the SSA. (Tr. 16-17.) The ALJ then noted that plaintiff "underwent a whole body scan which showed no evidence of functional thyroid metastases" in June 2008. (Tr. 17.) Finally, the ALJ reviewed the hearing testimony of Dr. Bernard Gustaf. (*Id.*)

The ALJ then went on to determine the weight to be given to medical opinions in the record. (*Id.*) The ALJ gave "little weight" to the disability examiner, reasoning that the examiner is not a medical professional. (*Id.*) The ALJ found Dr. Guttman's opinion to be well supported by the objective medical evidence and accordingly gave it "significant weight." (*Id.*) The ALJ gave Dr. Kundu's opinion "substantial weight" based on the fact that Dr. Kundu had examined plaintiff on "numerous occasions" and because his opinion was well supported by the objective medical evidence. (*Id.*) The ALJ also gave Dr.

Gustaf's opinion "substantial weight" based on the fact that Dr. Gustaf had examined the record, was present during plaintiff's testimony, and because the ALJ determined that Dr. Gustaf's opinion was well supported by the objective medical evidence. (Tr. 17.) The ALJ determined that Dr. Salon's opinion was not fully supported by the objective medical evidence, because the objective medical evidence pointed to "somewhat more severe limitations" that Dr. Salon believed existed. (*Id.*) The ALJ then stated that Dr. Salon's opinion was outweighed by the opinions of Dr. Kundu, Dr. Guttman and Dr. Gustaf. (*Id.*) The ALJ opined that RFC assessment in his decision was supported by the medical record and by the opinions of Dr. Kundu, Dr. Gustaf, and Dr. Guttman. (*Id.*)

After determining that plaintiff's RFC enabled her to do "light work," the ALJ proceeded to step four and concluded that the plaintiff was unable to perform her past relevant work, which included jobs as a clerk, customer service representative, and babysitter. (*Id.*) However, at step five, the ALJ ruled that, considering plaintiff's age, education, work experience, and RFC, there were "jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 18.) The ALJ's ruling was based on Medical-Vocational Rule 202.17, which states that a younger individual of age eighteen to forty-

nine, who is literate and able to communicate in English, and is unskilled, and retains the capacity to perform limited to light work, is considered not disabled under the regulations due to the individual's ability to find a job in the national economy. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.17. Although the ALJ mentioned that if a claimant has nonexertional limitations, the Grid can only be used as a framework, plaintiff's nonexertional limitations documented by Dr. Kundu and Dr. Guttman were not discussed.[73] (Tr. 18.) The ALJ denied plaintiff's SSI claim under the last step of the five-step sequential analysis. (*Id.*)

## D. Analysis

The ALJ's denial of plaintiff's SSI claim hinged primarily upon his determination that plaintiff retained the RFC to perform the full range of light work and that there were a significant number of jobs in the national economy that plaintiff could perform. (Tr. 14, 18.) At step four of the five-step sequential analysis, the ALJ accepted certain physicians' opinions and discredited the opinions of others,

---

[73] Dr. Guttman's report noted that plaintiff suffered from asthma and had limitations on bending and squatting. (Tr. 184-87.) Dr. Kundu's report also stated that plaintiff had asthma. (Tr. 155, 159, 193.) Furthermore, Dr. Kundu opined that she should never have to balance, stoop, kneel, crouch, crawl, or be exposed to unprotected heights, moving mechanical parts, humidity, wetness, pulmonary irritants, extreme temperatures, or vibrations, and that plaintiff should never operate a motor vehicle. (Tr. 157-59, 191-93, repeated at Tr. 211-14.)

including the RFC opinion of plaintiff's treating physician, and discredited plaintiff's testimony regarding her subjective complaints of pain. (Tr. 14-15, 17.) At step five, the ALJ relied on the Grid to determine that plaintiff could perform other work in the national economy, without first making an on-the-record determination about what effects, if any, plaintiff's nonexertional limitations, such as her environmental limitations, had on her ability to perform the full range of light work. (*See* Tr. 17-18.)

The defendant argues that the ALJ correctly concluded that, despite plaintiff's impairments, she was able to perform light work existing in significant numbers in the national economy, and was, thus, not disabled. (ECF No. 11, Mem. of Law in Supp. of Def.'s Mot. for Judgment on the Pleadings ("Def.'s Mem.") at 3.) Specifically, the defendant argues that the ALJ correctly: (1) determined that plaintiff retained the residual functional capacity to perform light work; (2) accepted the portions of plaintiff's treating physician's opinion that were consistent with and supported by the record; (3) concluded that plaintiff's subjective complaints were not credible to the extent alleged; and (4) met his burden at step five by relying on the Grid. (Def.'s Mem. at 11-17.)

Liberally construed, plaintiff's complaint can be read

to give rise to three separate but interrelated arguments with
regard to the ALJ's disability determination. *See Bertin v.
United States*, 478 F.3d 489, 491 (2d Cir. 2007) (holding that
courts must liberally construe pleadings and briefs submitted by
*pro se* litigants and read such submissions so as to give rise to
the strongest arguments that they suggest). First, plaintiff's
complaint explicitly challenges the ALJ's failure to explain why
he declined to credit the opinion of plaintiff's treating
physician in determining plaintiff's RFC. (ECF No. 1, Compl. at
2) ("I have been under my doctor's care for over ten years. I
do not feel that a doctor that doesn't know my medical history
and [has] only [seen] me for one checkup can determine how my
body feels and what I am able to do and what length of time I
can do it for.") Second, the plaintiff disputes the ALJ's
finding that her statements about her symptoms were not entirely
credible. (*See id.*) Third, plaintiff's complaint implicitly
contests the ALJ's failure to consider her nonexertional
limitations when making his disability determination at step
five. (*See id.*) Therefore, the critical questions upon review
are whether or not the ALJ appropriately explained his RFC
determination, whether the ALJ properly found that plaintiff's
complaints were not credible, and whether the ALJ properly
considered the existence of nonexertional limitations in light

of the evidence in the administrative record.

## 1. The ALJ's RFC Determination

The ALJ failed to explain why he did not credit Dr.
Kundu's RFC determination as it pertained to the plaintiff's
ability to perform a full range of light work and failed to
perform a function-by-function analysis.

### a. *The ALJ Failed to Explain Why He Credited Dr. Gustaf's RFC Opinion Over Dr. Kundu's RFC Opinion*

In determining plaintiff's RFC, the ALJ afforded
"substantial weight" to the opinion of plaintiff's treating
physician, Dr. Kundu,[74] and to the opinion of Dr. Gustaf, and
assigned "significant weight" to the opinion of Dr. Guttman.
(Tr. 17.)  The ALJ found that all three of these doctor's
opinions were "well supported by the objective medical
evidence."  (*Id.*)  The ALJ afforded "little weight" to the
opinion of Mr. Ramos, the state disability examiner, because he
was not a medical professional.  (*Id.*)  Finally, the ALJ held

---

[74] There is nothing in the opinion to the indicate whether, by assigning
Dr. Kundu's opinion "substantial weight," the ALJ intended to or declined to
give Dr. Kundu's opinion "controlling weight" as to the nature and severity
of plaintiff's impairments.  However, considering that the ALJ agreed with
Dr. Kundu's assessment of plaintiff's severe medically determinable
impairments, it appears that, in practice, the ALJ afforded controlling
weight to Dr. Kundu's opinion on the nature and severity of plaintiff's
medically determinable impairments.  (Tr. 14.)  Nevertheless, on remand, the
ALJ shall state whether he gave controlling weight to Dr. Kundu's opinion as
to the nature and severity of the impairments, and if he declines to do so,
he must provide good reasons for assigning Dr. Kundu's opinion "substantial"
instead of "controlling" weight.  *See* 20 C.F.R. §§ 404.1527(d)(2),
416.927(d)(2); *see also Burgess*, 537 F.3d at 128-29.

that the opinion of Dr. Salon was "not fully supported by the objective medical evidence which indicate[d] somewhat more severe limitations" and accordingly found that the opinions of Dr. Kundu, Dr. Guttman, and Dr. Gustaf outweighed the opinion of Dr. Salon. (*Id.*)  The ALJ then stated that his RFC assessment that plaintiff could engage in a full range of light work was supported by the opinions of Dr. Kundu, Dr. Gustaf, and Dr. Guttman. (*Id.*)

However, a plain reading of the ALJ's opinion makes clear that he rejected Dr. Kundu's RFC determination without setting forth good reasons for doing so, as the ALJ is required to provide. *See Snell*, 177 F.3d at 133.  Dr. Kundu and Dr. Gustaf provided conflicting opinions regarding plaintiff's exertional capacities that lead to opposite conclusions about her ability to engage in light work.  In order to meet the exertional requirements for the full range of light work, a person must be able to stand, walk, or do some combination of both for approximately six hours in an eight-hour work day. *Mancuso*, 361 Fed. Appx. at 178 (citing 20 C.F.R. § 404.1567(b) and SSR 83-10, 1983 WL 31251, at *5-6 (1983)); *see also* 20 C.F.R. § 416.967.  Twice, Dr. Kundu opined that plaintiff could stand for approximately two hours at a time, walk for approximately one hour at a time, and do both for the same total

amount of time in an eight-hour work day, for a combined total
of three hours in an eight-hour work day. (Tr. 156, 190,
repeated at Tr. 211.) Dr. Gustaf, meanwhile, testified at
plaintiff's hearing that, in his opinion, plaintiff could walk
or stand in some combination for an hour at a time and for six
hours total in an eight-hour work day. (Tr. 30.) Thus, Dr.
Gustaf's conclusion that plaintiff could walk or stand for a
total of six hours was in direct conflict with Dr. Kundu's
conclusion that plaintiff could walk or stand for a total of
three hours.[75] By determining that plaintiff could perform a
full range of light work, the ALJ concluded that plaintiff could
stand or walk in some combination for at least six hours in an
eight hour work day. The ALJ's determination on this point
apparently is based upon Dr. Gustaf's conclusions, but is
inconsistent with Dr. Kundu's opinion about plaintiff's RFC.
(*See* Tr. 18.) Had the ALJ's RFC determination been consistent
with Dr. Kundu's RFC opinion, the ALJ would not have decided
that plaintiff could perform the full range of light work.

Moreover, a finding that a claimant is able to perform

---

[75] Dr. Guttman, in his consultative examination, opined that plaintiff had
"moderate restrictions to walking, bending, lifting, squatting, and carrying
because of patellofemoral syndrome with knee pain," but he did not give an
estimate of the number of hours plaintiff could sit, stand, or walk, and did
not estimate the amount of weight she could lift. (Tr. 186.) Therefore, the
record contains no guidance as to whether Dr. Guttman's RFC opinion comports
with an ability to perform light work.

the full range of light work necessarily encompasses the finding
that the claimant can do sedentary work, "unless there are
additional limiting factors such as loss of fine dexterity or
inability to sit for long periods of time." *Casino-Ortiz v.
Astrue*, No. 06-CV-0155, 2007 WL 2745704, at *5 n.13 (S.D.N.Y.
Sept. 21, 2007) (citing 20 C.F.R. § 404.1567(b)); *see also* SSR
83-10, 1983 WL 31251, at *3. The Commissioner's regulations
state that sedentary work requires sitting for approximately six
hours total and standing or walking for about two hours in an
eight-hour work day. *See Rosa*, 168 F.3d at 78 n.3; *see also* 20
C.F.R. § 404.1567(a). A claimant who is only able to sit up to
five hours is not capable of performing sedentary work. *See,
e.g.*, *Miceli v. Chater*, No. 95-CV-3763, 1996 WL 370161, at *1
(E.D.N.Y. June 24, 1996). Here, Dr. Gustaf offered no testimony
addressing the amount of time plaintiff could sit. On the other
hand, Dr. Kundu opined that plaintiff could only sit for five
hours in an eight-hour work day. (Tr. 190, 211.) Meanwhile,
plaintiff stated in a March 29, 2007 disability report that
sitting "for too long" caused her to experience pain. (Tr.
115.) Thus, the ALJ's implicit finding that plaintiff could
perform sedentary work also indicates that Dr. Kundu's RFC
opinion was not credited.

Although the ALJ was not required to adopt Dr. Kundu's

RFC opinion in making the RFC determination nor required to credit Dr. Kundu's RFC opinion over Dr. Gustaf's, *see Francois*, 2010 WL 2506720, at \*6, the ALJ was required to explain why he chose not to credit Dr. Kundu's RFC opinion, as plaintiff's treating and medical source. *See Snell*, 177 F.3d at 133; *Martinez*, 2010 WL 331694, at \*9. Furthermore, the ALJ was required to reconcile the conflicting RFC opinions of Dr. Kundu and Dr. Gustaf. *See Caserto*, 309 F. Supp. 2d at 445.

Here, however, instead of setting forth "good reasons" for failing to credit Dr. Kundu's opinion of plaintiff's RFC, the only remarks made by the ALJ with regard to Dr. Kundu's RFC determination suggest that Dr. Kundu's opinion should have been credited. For example, the ALJ pointed out that Dr. Kundu examined plaintiff many times, and that his opinion was "well supported by the objective medical evidence." (Tr. 17.)

The regulations referenced in *Snell* provide the ALJ with several enumerated factors to guide the ALJ's determination of how much weight a treating physician's opinion should receive if such an opinion is not afforded controlling weight. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Snell*, 177 F.3d at 133 ("Under the applicable regulations, the Social Security Administration is required to explain the weight it gives to the opinions of a treating physician.") (citing 20 C.F.R.

§ 404.1527(d)(2)).[76]  On remand, the ALJ shall provide clear

reasons for the decision not to credit Dr. Kundu's RFC opinion,

considering the length, nature and extent of the treatment

relationship, the frequency of examination, the degree to which

Dr. Kundu's opinion was consistent with the record as a whole,

including the fact that it was inconsistent with Dr. Gustaf's

RFC opinion, whether Dr. Kundu was a specialist in an area of

medicine that related to one of plaintiff's impairments, and

whether there were any other factors that "support or

contradict" Dr. Kundu's opinion.  *See* 20 C.F.R.

§§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).  The ALJ may also

consider Dr. Kundu's "understanding of [SSA] disability programs

and their evidentiary requirements . . . and the extent to which

[Dr. Kundu was] familiar with other information in [plaintiff's]

case record."  *Id.*

Based on defendant's contention that the ALJ only

"gave substantial weight to Dr. Kundu's opinion to the extent

---

[76]     The regulations do not explicitly require the ALJ to consider these
five factors when determining the weight afforded to a treating physician's
opinion on disability or employability.  *See* 20 C.F.R. §§ 404.1527(d),
404.1527(e) (requiring consideration of the factors only when evaluating a
treating source's medical opinion on issues not reserved to the
Commissioner).  However, the Second Circuit in *Snell* made clear that the
ALJ's obligation to give "good reasons" for the weight afforded to treating
physicians even on issues of disability and employability arises out of 20
C.F.R. § 404.1527(d)(2).  *See Snell*, 177 F.3d at 133-34.  Accordingly, the
court considers each of the five factors articulated in 20 C.F.R.
§ 404.1527(d)(2) not as requirements but as a guide in evaluating whether or
not the ALJ gave adequate reasons in determining the weight given to Dr.
Kundu's opinion on plaintiff's RFC.  *See id.*

that it was supported by the record" (Def.'s Mem. at 13), the
ALJ shall make such findings explicit on remand.  Furthermore,
the ALJ shall attempt to reconcile the conflicting RFC opinions
of Dr. Kundu and Dr. Gustaf.  *See Caserto*, 309 F. Supp. 2d at
445.  Finally, if the ALJ finds plaintiff incapable of the full
range of light work, he shall make a determination as to whether
plaintiff is capable of sedentary work.  If the ALJ finds
plaintiff capable of sedentary work, he shall identify evidence
in the record demonstrating that plaintiff can sit for at least
six hours in an eight-hour work day, and explain the reasons for
discrediting Dr. Kundu's opinion that plaintiff is not capable
of sitting for more than five hours of an eight-hour work day.
*See* 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

### b. The ALJ Failed to Make a Function-by-Function Assessment of Plaintiff's Abilities

Although not specifically raised by the plaintiff, the
court finds that the ALJ did not conduct a function-by-function
assessment of plaintiff's ability to sit, stand, walk, lift,
carry, push, pull, reach, handle, stoop, or crouch, based on
medical source opinions of plaintiff's ability to perform each
activity, as required by the regulations.  *See Yannone v.
Astrue*, No. 06-CV-15502, 2010 WL 743963, at *6 (S.D.N.Y. Mar. 3,
2010) (citing 20 C.F.R. § 404.1513(c)(1)); S.S.R. 96-8p, 1996 WL

374184, at *7 ("In assessing RFC, the [ALJ] must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing bases (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.)

At step four, the ALJ referred to the opinions of Dr. Salon, Dr. Kundu, Dr. Guttman, and Dr. Gustaf, and summarized each of those physicians' findings as to these aforementioned functions. (Tr. 16.) However, the ALJ never stated, for example, how long he determined plaintiff could sit, stand, or walk in an eight-hour work day or how many pounds plaintiff could lift. Nor did the ALJ's RFC assessment include a narrative discussion describing how the medical and nonmedical evidence supported conclusions about plaintiff's ability to perform each function. *See Yannone*, 2010 WL 743963, at *6. The ALJ was required to complete such an analysis before expressing RFC in terms of an exertional level of work, which, the ALJ determined to be light work. *Id*. On remand, the ALJ shall conduct such an assessment. *See Mardukhayef v. Comm'r of Soc. Sec.*, No. 01-CV-1324, 2002 WL 603041, at *5 (E.D.N.Y. Mar. 29, 2002) (remanding so that the ALJ could assess plaintiff's

ability to perform the functions in paragraph (b), (c), and (d) of 20 C.F.R. § 404.1545 and 416.945).

2. <u>The ALJ Failed to Adequately Detail the Basis for His Assessment of Plaintiff's Credibility</u>

The ALJ failed to detail the basis for his credibility assessment of plaintiff's subjective statements about her symptoms with enough specificity for the court to determine whether the assessment was supported by substantial evidence. *See Alcantara*, 667 F. Supp. 2d at 278 (remanding where an ALJ did not explain how the factors in 20 C.F.R. § 404.1529(c)(3) impacted her assessment of plaintiff's credibility); *see also Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988) ("A finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligent plenary review of the record."). Here, the ALJ stated that plaintiff's "medically determinable impairments could reasonably be expected to produce" the symptoms she alleged; however, the ALJ found plaintiff's claims about "the intensity, persistence and limiting effects" of her impairments were "not credible to the extent they are inconsistent with the [RFC] assessment for the reasons explained below." (Tr. 15.) The ALJ's statement that plaintiff's claims were inconsistent with the RFC assessment appears to refer to

the requirement that the ALJ determine the degree to which plaintiff's claims are consistent with the evidence in the record. *See Genier*, 606 F.3d at 49; C.F.R. § 404.1529(b)). However, the regulations require the ALJ to make a credibility determination based on a consideration of six specific factors, and to give reasons for his determination based on these factors that are sufficiently specific for a reviewing court to decide whether that determination was based on substantial evidence. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(i)-(vii); *see Alcantara*, 667 F. Supp. 2d at 277-78. The ALJ did not explicitly address the relevant factors and give specific reasons for his credibility determination based on those factors. Instead, the ALJ summarized the medical record. (Tr. 15-17.)

As defendant argues, the ALJ's medical summary does address evidence related to some of the factors enumerated in 20 C.F.R. § 404.1529(c)(3). (Def.'s Mem. at 15.) For example, the ALJ references a discussion of claimant's daily activities,[77] the

---

[77] The court notes that although the ALJ stated that Dr. Gustaf testified that plaintiff was "able to perform activities of daily living such as cooking and cleaning" (Tr. 17), when Dr. Gustaf addressed the plaintiff at the hearing, he stated she was "presumably" cooks and cleans. (Tr. 31.) In response, plaintiff clarified that she required assistance completing these tasks. (Tr. 31.) Moreover, there are examples throughout the record of other statements by plaintiff and by Dr. Guttman that plaintiff required assistance with these tasks and other routine household chores. (*See* Tr. 107-10, 185 (Plaintiff "does no cooking, cleaning or laundry.").)

location of her symptoms, and treatments she received.[78]  (Tr.
15-17.)  However, the ALJ did not address and explain how the
duration, frequency, or intensity of plaintiff's symptoms, the
precipitating and aggravating factors regarding her symptoms, or
the medications she takes factored into his credibility
assessment.  *See* 20 C.F.R. § 404.1529(c)(3); (Tr. 15-17.)  The
court cannot perform a meaningful review of the ALJ's
credibility determination based on a single statement
summarizing the credibility finding, followed by a brief review
of the record, where the ALJ failed to set forth the factors
with sufficient specificity to enable the court to decide
whether the ALJ's credibility determination was supported by
substantial evidence.  *See Alcantara*, 667 F. Supp. 2d at 278
(finding that the court could not perform a meaningful review of
an ALJ's credibility determination where the ALJ stated that the
plaintiff's "'allegations regarding her limitations are not
totally credible for the reasons set forth in the body of the
decision,'" but never explained how the factors she discussed
impacted the ALJ's determination.)

3. The ALJ Failed to Address Whether Plaintiff's
   Nonexertional Limitations Significantly Limited Her
   Employment Options

    At the fifth step of the Commissioner's disability

---

[78] For instance, the ALJ mentioned that plaintiff was treated for complaints of
knee pain in 2006.  (Tr. 15.)

evaluation process, the ALJ failed to explicitly consider whether plaintiff's nonexertional limitations significantly diminished the range of work that plaintiff could perform. *See Nigino*, 2009 WL 840382, at *5-6. Furthermore, to the extent that the ALJ found that plaintiff's nonexertional limitations diminished her range of work, he erred by failing to identify or include evidence in the record, via testimony from a vocational expert or a similar source, that a significant number of jobs that plaintiff could perform exist in the national economy.

Because the ALJ reached the fifth step of the five-step statutory analysis, the burden shifted from the claimant to the Commissioner to show that there were a significant number of jobs in the national economy that plaintiff was able to perform. *See Butts*, 388 F.3d at 381. The ALJ made that showing by referring to the Grid. *See Mejia*, 2010 WL 2572006, at *12. Based on the ALJ's RFC determination that plaintiff was able to perform the full range of light work, and considering plaintiff's age, education, and work experience, the ALJ found that plaintiff was "not disabled" based on Medical-Vocational Rule 202.17. (Tr. 18); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.17.

However, plaintiff's nonexertional limitations were well-documented in the record. Plaintiff's treating physician

and two examining physicians each submitted reports to the Commissioner listing a number of nonexertional limitations. (*See* Tr. 129, 157-59, 184-87, 191-93, repeated at 211-14). Specifically, Dr. Guttman listed asthma and limitations on bending and squatting. (Tr. 184-87 ("The claimant should avoid exposure to smoke, dust, and other known respiratory irritants.").) Dr. Kundu listed asthma and opined that plaintiff should never have to balance, stoop, kneel, crouch or crawl, or be exposed to unprotected heights, moving mechanical parts, humidity, wetness, pulmonary irritants, extreme temperatures, vibrations, or operate a motor vehicle. (Tr. 157-59, 191-93, repeated at Tr. 211-14.) Dr. Salon, as well as Mr. Ramos, advised that plaintiff should avoid respiratory irritants because of her history of asthma. (Tr. 129, 150.) Notably, Dr. Gustaf never specifically opined about plaintiff's nonexertional limitations. (*See* Tr. 27-30.)

The ALJ noted that, where nonexertional limitations exist, the Grid is to be used as a framework for the disability determination, rather than to direct a conclusion as to whether the individual is disabled. (Tr. 18.) Had the ALJ determined, after examining the record, that substantial evidence supported the position that the nonexertional limitations did not significantly narrow plaintiff's employment options, reliance on

the Grid would have been appropriate. *See Bapp*, 802 F.2d at 605. However, the ALJ did not make such a determination. (*See* Tr. 18.)

Defendant argues that Dr. Kundu's opinion of plaintiff's environmental limitations was not supported by the record because Dr. Gustaf opined that her asthma was not severe enough to meet the criteria for a listed disability. (Def.'s Mem. at 13-14.) However, the fact that a medical problem does not rise to the level of a listed disability does not preclude it from being a severe impairment, as the ALJ correctly noted. (Tr. 14); *see generally Burgos*, 2003 WL 21983808 (remanding with instructions to introduce testimony from a vocational expert as to whether jobs existed in the national economy that plaintiff, who suffered from asthma that was considered "severe" but did not rise to the level of a listed disability, could perform).

Defendant argues, in the alternative, that plaintiff's asthma "would have a minimal impact on the range of available light work." (Def.'s Mem. at 17.) However, whether plaintiff's asthma significantly diminished her employment opportunities is a determination that must be made on the record by the ALJ. *See Nigino*, 2009 WL 840382, at *6 (remanding because the ALJ failed to consider whether the range of work the plaintiff could perform was significantly diminished by her nonexertional

limitations).  Finally, even if the ALJ had determined on the record that plaintiff's asthma did not significantly diminish her employment opportunities, the defendant's argument ignores the other nonexertional limitations detailed in the record, which the ALJ also failed to consider on the record before relying to the Grid.  (*See* Tr. 129, 157-59, 184-87, 191-93, repeated at Tr. 211-14).

On remand, the ALJ shall determine on the record, in light of any change to the ALJ's RFC finding based on a reevaluation of Dr. Kundu's opinion, and in light of any changes to the ALJ's determination of the credibility of plaintiff's statements about her symptoms, whether the effects of all of plaintiff's nonexertional limitations preclude reliance on the Grid.  To the extent the ALJ determines that the nonexertional limitations significantly diminish plaintiff's employment opportunities, the ALJ shall introduce evidence into the record, via testimony from a vocational expert or a similar source, that a significant number of jobs that plaintiff could perform exist in the national economy.

## CONCLUSION

For the foregoing reasons, the court denies defendant's motion for judgment on the pleadings and remands this case for further proceedings consistent with this opinion,

specifically:

(1) If the ALJ declines to credit Dr. Kundu's opinion of plaintiff's RFC, he shall provide explicit reasons for doing so, in accordance with *Snell*, 177 F.3d at 134, and shall apply and reference the statutory factors listed in 20 C.F.R. §§ 404.1527(d)(2)-(6) and 416.927(d)(2)-(6) in his reasoning. If the ALJ finds that Dr. Kundu's opinion is inconsistent with substantial evidence in the record, he shall explain why he believes that to be the case, citing evidence from the record. This is especially important in order to reconcile the ALJ's previous finding that Dr. Kundu's opinion was well-supported by the objective medical evidence. Further, the ALJ shall specifically reconcile the conflicting RFC determination of Dr. Kundu and Dr. Gustaf. Finally, if the ALJ finds that plaintiff is not capable of the full range of light work, he shall make a determination as to whether plaintiff is capable of sedentary work.

(2) The ALJ shall perform a function-by-function assessment of plaintiff's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch, based on medical and nonmedical evidence in the record.

(3) The ALJ shall give specific reasons for the credibility assigned to plaintiff's statements about the

severity of her symptoms, taking into account the relevant factors enumerated in 20 C.F.R. § 404.1529(c)(3), and set forth his determination with sufficient specificity so that the court can determine whether the credibility determination is supported by substantial evidence.

(4) The ALJ shall determine on the record whether plaintiff's nonexertional limitations, including those listed by Dr. Kundu and by Dr. Guttman, significantly limit the work available to plaintiff, so that the court can determine whether the decision is supported by substantial evidence. Specifically, the ALJ shall determine whether plaintiff's nonexertional limitations exclude her from particular occupations or kinds of work that fall within the level of work her RFC dictates she is able to do.  If the ALJ finds that plaintiff's nonexertional restrictions significantly limit plaintiff's employment options, the ALJ shall seek out the testimony of a vocational expert or evidence of a similar nature as part of his affirmative duty to develop the record.

The Clerk of the Court is respectfully requested to close this case.  The defendant shall serve a copy of this Memorandum and Order on the plaintiff and file a declaration of

service by ECF no later than December 13, 2010.

**SO ORDERED.**

Dated:     December 9, 2010
           Brooklyn, New York

                                   _____ /s/_____
                                   Kiyo A. Matsumoto
                                   United States District Judge